1-4-3-6-8-0 Anthemus Panteleris v. Allison Panteleris Arguments not to exceed 15 minutes per side  Panteleris v. Panteleris 1-4-3-6-8-0 All right, the appellate may proceed. Good afternoon. Good afternoon. Lost your audience, I see. Yes, that's what I noticed as well. Attorney Amanda Jackson appearing on behalf of the appellant, Allison Panteleris. I would like to reserve five minutes on rebuttal, if I may please. Today I'd like to start out primarily addressing our first two assignments of error. The first assignment of error that we described in our brief is that the petitioner or appellee failed to prove as a threshold matter that an actual wrongful retainment of the minor children occurred. This court previously in 2009 in the Jenkins v. Jenkins case found that the petitioner failed to prove that the children had actually been wrongfully retained. And therefore, as a threshold matter, the petition was denied. In that case, the fact pattern was very similar to this. Both parents move with their child from Israel to the United States. At some point afterwards, the party's marriage deteriorated, and the mother of the child decided to return back to Israel to live. She wanted to take the child with her. Father refused to allow her to do so, and she ended up on her own going back there. She then filed a petition asking that the court order the child return to Israel, claiming that the child had been a habitual resident of Israel. This court, after reviewing the case, found that there was no actual retainment, wrongful or otherwise, since the parties had moved together to the United States. That is exactly what has happened here. Isn't that a factual determination? I mean, the parties gave different accounts of the circumstances of their move here, right? He said it was just supposed to be temporary. Correct. He did say that. However, the other testimony in this case, which significantly outweighed what the petitioner brought, was that the move was not, in fact, temporary. Not only did the respondent testify that it wasn't temporary, but you also had her family members, mutual friends of the parties, a government worker who had no reason to be biased at all, all thought that this move was permanent. Neighbors that had met them when they moved here all believed that this move wasn't temporary, but that the intent was that they were relocating. So is the standard clearly erroneous? What is the standard? Well, I believe the standard, looking at past case law, is actually a mixture of fact and law. Previously, in US v. TACO in 2000, this court looked at determining habitual residents and found that the review should be de novo. And Robert V. Tessin in this court said that it's a question of fact. Thus, I think that the standard appears to be a mixed question of fact. OK, are you directing yourself now to habitual residents or wrongful detention? Well, I'm starting out. I believe there was never any wrongful retention at all to begin with. The parties moved here together. Mr. Pantelaris, on his own, decided to move back to Australia, did not take the children with him, did not even ask to take them. OK, so then we're sort of going around in circles. So then my question is, isn't that a trial court determination? And what is the standard to review that? I mean, and then you went into the habitual residents. Well, in Simcox in 2007, this court said that when there's a mixed question of law and fact, the court should review it de novo. So falling back on that, I believe that prior cases have reviewed it as both de novo and as a question of fact. So I believe that it's a mixed standard. The father said that there was a wrongful retention, right? He did say that. Well, if he says that and she says to the contrary, isn't that a question of fact, if the court could come down on either side? That would be a question of fact, yes. And the court ruled against your client on that? Correct, but I mean, I believe that the plethora of other evidence submitted, including the testimony of a number of other witnesses, show that that was clearly erroneous in her finding. The only testimony that it was possibly a vacation, that it wasn't a move, and that she wrongfully would have retained the children was his testimony alone. And that's it. Well, I mean, if he is more credible than her witnesses, isn't that sufficient to support the trial judge's fact finding? I don't believe that. I mean, just because you have one witness against four, if the one witness is the more credible, that can be sufficient to sustain a fact finding, can it not? I don't believe that your review of the record would show that his testimony alone was more credible than. Well, on appeal, we don't make credibility findings on appeal, because we really can't. That's what we rely on, the finder of fact, the jury or the judge in a bench trial. But I guess I'm asking you, hypothetically, if a trier of fact finds one witness to be more credible than three or four or 10 on the other side, the trier of fact can do that, can't it? I believe the trier of fact can, in fact, do that. But I don't see how there can be a finding that there'd been a wrongful retainment, even if the parties were on vacation. Mr. Pantelaris never made any arrangements for the children to ever return to Australia. There was never a decision as to if the children would return, when the children would return, where they would return to. Didn't he testify that they had an understanding, that they were only coming temporarily and the whole family was going to move back? That's what he testified. Right. That's the way a trial works. One person says one thing, the other person says something else. You have a judge who decides who to believe. Is that your whole argument here, that the judge believed the wrong person? No. No, I don't believe so. I believe that in addition to that, when she looked at, as to our second assignment of error, when she looked to determine what the habitual residence was of the children at the time of the, he alleged that there was a wrongful retainment of May of 2013, that she was incorrect in determining that it was Australia. OK, did you argue that she had to look at these three children as separate individuals? No. So you made no argument that a four-month-old, that a child who's four months old and then comes and lives in a new environment for a year, did you make any argument about that? That that child's habitual environment is going to be where she spent the last year? Well, I believe through the testimony, yes. I mean, we did argue that the children were very young when they came to the United States and that, therefore, they had acclimated to the country. In particular, because of the child being only four months old when she arrived, the other two children were three and five. And the three-year-old suffers from severe autism. And then, therefore, his perception of home was probably very difficult to ascertain. And that, therefore, the intent of the parents was very important in determining whether. Well, that's a different argument, right? OK. And is that the, you're pursuing that argument here, too? That you go by the intent of the parents? Yes. I believe that it's necessary in this case to look at the intent of the parents when you're determining habitual residence. Why? Why wouldn't you just look at a child who was three and then comes to this country and is receiving treatment for autism and therapy and all of that, which he didn't have before and what a child of four generally remembers? Why wouldn't you just focus on the facts of his life? Because the intent of the parents at that young of an age has a significant influence on what the children believes to be home. A four-month-old can't create an understanding of what home is other than that environment set up by that parent. Likewise, I believe because this child, even though he was age three, he was very young, but also because of his disability, could also likewise not have created his own idea of home. It seems to me that you gave up your best arguments. I just, I don't understand. The law, isn't the law against you on the parents' intent? In this particular district, it is, pursuant to the Friedrich case. But in Robert v. Tessin, I believe this court was very clear that the judgment as to whether or not the intent of parents would be considered in cases where children were very young or perhaps suffered from some kind of developmental disable was not being looked at in those particular cases because the facts in those cases didn't involve children of young ages necessarily. So therefore, I think this is the perfect opportunity for this court to look to the issue of parental intent and consider that as a possible factor. Even if this court isn't going to look at all to parental intent, the fact that the court didn't follow Article 3 of the Hay Convention, which says that the children's habitual residence will be the place that they are living immediately preceding the wrongful retainment, that in and of itself, I think, is enough to show that the determination that the habitual residence was Australia is incorrect. The children were living, in May of 2013, in the United States and had been in the United States for 15 months, well over a period of a year. And that argument you made? Yes. I think it's interesting. You appear to concede that we look at the children collectively rather than individually. And that's the way the case is postured. Are you conceding that? I believe that the children, I think you have to consider the children collectively, despite the fact that they are at different places mentally to determine what they think home is. But I think the case together was, the petition was for return of all three children together, not return of one child versus the other. There were separate arguments made to each child, which I think there could be. And you're the appellant, so you frame the issues of error any way you want. But I would think at a case like this, you could view them separately, but you haven't framed the appeal that way. Well, how does that work? Let me just add with curiosity, how does it work when you have three children of three different ages and you view them collectively? Well, I think that the best way to look at it is the harm provided, the harm to the children in separating them, I think, is great. And I think that, therefore, you need to look at probably the youngest two children, because they are the ones that were going to be individually hurt the most by being uprooted and relocated. Even though the third child, potentially he was very young, you could argue that he could adapt. But I think the other two children's needs and their need to stay together outweighs that. But is that a factor of unhabitual? I'm sorry, what is the phrase? Habitual residence? Yeah, is that a factor? I don't believe it is. In most cases that have been looked at, there was typically only one child. This case is different in that there are three children that are of different ages, although they're all young, but they are of different ages. A four-month-old versus a five-year-old has a much different capacity for understanding and determining what they believe to be home to be. And then you also have this issue where, for the first time at least before this court, you do have a child that suffers from severe autism who's Does that go into the determination of a habitual environment? I think it goes into the argument of, yes, it does. Because in determining, this court previously held in Friedrich, that you need to look at whether or not a child is acclimated to their new surroundings, their new country, and developed a degree of well-settled purpose. A four-month-old who stays in the United States for 15 months of their 19-month life is going to have acclimated to the United States and believe that to be home. They only spent four months, and much of which they're not going to be able to recall in Australia. In particular, for the child that was developmentally disabled because of autism, his ability to comprehend what home was would have been very limited when he got here. Because of the therapy that he received and the programs he was involved in from the time he arrived during that 15 months, his ability to determine what was home would have increased substantially during that time. So I think it does matter. OK, so how does that translate into three children? Do you send them home if the oldest has a habitual environment in Australia? I mean, I don't understand. I think that the oldest child, I think there's an argument that the oldest child also had acclimated. He was only five when he arrived. His only formal schooling was in the United States. He started kindergarten shortly after he arrived. So he also had been in the United States for 15 months when the alleged wrongful retainment occurred. So 15 months of the life of a five-year-old, particularly if that's an entire year of school, is also a significant amount of time for him to have acclimated as well. At that point in time, he had become a resident, a habitual resident of the United States. He was no longer a resident of Australia. At some point in the past, he had. How did the trial judge deal with the fact that they had all been living in the States for a year before the wrongful detention? I don't believe she addressed it at all. I believe that the error in this case was that she was looking at where the children had lived prior to when they came to the United States. She didn't look at, in May of 2013, where were these kids living and how long had they been there? I think she completely overlooked that, which goes against the wording of the Hague Convention that you need to consider where the children were habitual residents of at the time of the alleged wrongful retainment. But also in Friedrich, that case law says you need to look at where the children were habitual residents at the time of wrongful retainment. If they alternate between two nations, which in this case, they had, you need to look at whether or not they had acclimated to the new nation. And a passage of time and geography can equate to a child acclimating. And I think that's the error here, is that she didn't look at that. I see you're out of time. You can use your five minutes rebuttal now, or you can save it. I would like to save it, please. Thank you. Good afternoon. Good afternoon. May it please the court. My name is Mitchell Tobias, and I represent the petitioner, Apolli Anthimus Pantelaris, in this matter. And this truly is a case where the district court, sitting as fact finder, heard hours of testimony from several witnesses, made credibility determinations, and reached the correct conclusions. Now, appellant challenges those credibility determinations and factual findings, including the factual finding of the children's habitual residence. But appellant has not shown clear error or abusive discretion by the trial court on any finding of fact. How did the trial court deal with the fact that they had lived in the states for a year? The trial court looked, in following Friedrich, and actually the court, coming back to a question that was asked, didn't look specifically at the intent of the parents, focused solely on this. Did not look at the subjective intent of the parents, other than a comment and a footnote. Focused, as this court had directed, on how the children had become acclimated, whether they had a degree of subtle purpose from their perspective. And the court accepted all of the evidence from appellant and her friends and family that provided testimony on that issue. The problem was, they didn't present testimony focusing on that period of time between the April 2012 or so period when the family left Australia and came to the US. And then when the wrongful retention occurred, whether it be March, April, May 2013. At multiple points in the actual hearing, the court stopped the testimony and inquired and said, it appears that you're focusing on the defense of well settled. And you're presenting evidence of what the kids are doing now. What their lives are now, being June and July of 2014. Are you trying to give me evidence of what happened between 2012 and 2013? And appellant didn't provide evidence to allow the court to consider if the habitual residence. I'm sorry, I don't understand what you just said. So the court looks, I mean, we presented on behalf of Mr. Pantelaris, we explained what the kids' lives were like in Australia. Why they were habitual residents of Australia. They were involved in many, many different things. In response to that, appellant here tried to present evidence of, or at least apparently intended to present evidence of why the habitual residence shifted. Sort of why the passage of time made from the kid's point of view, the US, their new habitual residence. But she didn't actually explain. She provided very little evidence of the kid's perspective in the time prior to the wrongful retention. I mean, this court has said the evidence that is relevant is what happened prior, excuse me, from the child's perspective. So you're saying that she presented evidence as of the day of trial, not as of May 2013? Yes, exactly. Okay, and it wasn't the same evidence? It didn't include anything that happened in that year or anything? It included very little, but there was no specificity of when things happened. So the testimony just said, well, the kids are in school and they see family and they do this and that. But it was never made clear to the trial court, is that now? Or is that in the time period that I can actually consider prior to the wrongful retention? And was that something that was called to counsel's attention? It was, it was clearly called to attention in the record. In our brief, we cite to that the actual testimony from the court saying, I'm unclear. Are you going to the well-settled defense, which I as the judge don't think applies here, or are you trying to put on evidence of habitual residence or something else? And rather than clarifying and saying something on the effect of, yes, it's habitual residence, this is the timeframe, the response was, oh, I'm sorry, I'll move on. In which case, the court apparently presumed that it truly was evidence of well-settled and was evidence effective as of the date of trial, not the date of habitual residence to allow for this determination. So all the court had to consider was the, all of the evidence that Mr. Pantelaris presented of, you know, again. How do you ignore that as a judge? How do you ignore that you have a child who came to the States at four months old, who's now been in the States for, you know, three quarters of the child's life? I mean, how do you ignore that? How do you possibly say that the habitual environment is elsewhere? I don't think the court completely ignored it. The court pointed out that the agreement was there was some, not so much with the youngest child, because there truly was very little evidence of the youngest. Because from a child of four months or one year, the perspective would just be the family environment. And whether, presumably if the kid's in a, the baby's in a house in Australia or in a house in the United States, is there really any degree of subtle purpose to think was the reason for the court's footnote in Robert V. So you're agreeing that it goes by parental intent? You agree that? I'm just saying that that is a situation where perhaps it is permissible. And the court was right when it said this may be a situation where we have to look at parental intent, because a child might not, a child of that young age may not lack the cognizance of its surroundings to determine whether it is acclimated to a new environment. If all the kids, if all the baby sees is- What do you do about a kid who's in autism treatment? That, I mean, that, from what I know about kids with autism, I mean, you know, that becomes a pretty central part of that kid's life, whatever facility or whatever sort of supportive environment he's in. How do you say that isn't part of the habitual environment? For one point, part of that has developed because of the wrongful retention. Well, no, that's, I mean, that would be the case if somebody, if she just took him, but he was in the States for a year before any of this happened. Right, well, he was diagnosed with autism in Australia. They came back to the United States on this trip. And then at some point, and I don't believe it was ever entered into the record, when the further diagnosis was made and when testimony, or excuse me, when any treatment began. So it's unclear from the record if the middle child was in this treatment for one month, two months, it's just not clear. But there's also no reason that the child can't be taken back to his residence in Australia and be put into the same type of autism support environment there. It's a different question. I mean, that goes to what's best for the child, not what the child's habitual environment is. But in that case, the question I just go to, whether there is this settled degree of purpose. And there was no testimony that said, just to move him, I mean, because he saw a doctor, is that enough? I don't know. The trial court. Did anybody testify or put in evidence about the treatment in the U.S. is better than the treatment in Australia for autism or anything of that nature? No, Your Honor, I don't recall any evidence to that effect. I would think we'd almost have to assume that Australia has advanced medical treatment, but I don't know. But nobody said, I guess we can't assume it. And did the judge give any significance or weight or anything to the fact that the children had lived here for a year before the wrongful detention? Yes, the court did weigh the factors in this habitual residence determination and said the only evidence, however, of the United States was they were in some schooling for some partial, a part of a year. So they were at a few months of schooling and they spent time with their immediate family. So if we're looking at all the factors set forth by this court, such as participation in social engagements, sports, other meaningful connections with people or places in the U.S., the only evidence that came out was they were in preschool or another school for some part of the year and that they had a relationship with their nearby family. That's it. Versus all of the evidence of life in Australia, which the court also weighed and said all of these elements were satisfied. There were social connections, there were participation in sports, there were connections with not just family but family friends, pictures were introduced of the children interacting with friends, and while the children were in the U.S., they remained in contact with their Australian family. So there was no hard break that said just because you're here in the U.S., you're cut off from your family and friends in Australia. The family remained in contact via Skype with their family in Australia, at least until around the time of the wrongful retention. So it was truly a weighing and there is no bright line that says if you come to the U.S., if you bring children to the U.S. for X number of months, that's it, your habitual residence has changed. It truly is highly fact-intensive analysis and the court listened to all the evidence and just found that based on everything that was presented, the connections, the children's connections were with Australia and in the time they spent in the U.S., there just weren't enough new connections to create this acclimatization to make the children feel that yes, we've truly come to the U.S., we're now gonna stay here, we've broken our relationship with Australia, that's no longer a habitual residence and it isn't truly, habitual residence is a term of art, it's not just your current geographic location or where your domicile is, it's looking at all of these factors as this court has explained. And as far as this sort of retention issue that appellant brought up, it is a bit of a unique issue that Jenkins v. Jenkins seems to be the only case where this sort of preliminary burden was discussed and it appears that in the U.S. Supreme Court's more recent guidance in Abbott, the sort of foundation for the Jenkins description of this retention no longer should apply because the court in Jenkins seemed to look at this right of joint custody and said, okay, you both had a right to determine where the child lived, at this point in time, one of you went back to Israel, one of you stayed here, you both had a joint right to custody, therefore one of you had a right to visit, it's not really a right to custody, there is no retention. But in Abbott, the U.S. Supreme Court made clear that when there is a shared or joint right to determine a child's place of residence, that's without doubt a right of custody, not a simple right of access as a court found in Jenkins  as provided for in the Hague Convention and in ICARA. Even this court in Friedrich in the removal context said that in the joint custody situation, we are well aware that our approach requires a parent in the event of a separation or custody dispute to seek permission from the other parent or from the courts before taking a child out of the country of its habitual residence. So here, just as a wrongful removal under Friedrich could be found if a parent had taken the children out of Australia without asking, a wrongful retention occurred here when a parent denied Mr. Pantelaris his request to have the children reunited with him in Australia, which was the court found to be their habitual residence. So as Jenkins sort of had this dual, first they relied on retention and then habitual residence. Habitual residence might've been the right finding, it was, the end result was the same. But Jenkins is the only court that set out this initial step of finding a retention, which really under the convention is just defined as the removal or retention without any real definition is considered wrongful when in the breach of custody rights, et cetera, et cetera, et cetera. So this, that Jenkins' analysis just seems inapplicable here and does conflict with both Abbott and the court's initial decisions in Friedrich. So I believe Judge Seiler, you were on the panel of that Friedrich II, which is sort of one of the seminal cases, as you know, on this topic in the circuit. And beyond talking about habitual residence, the issues of this retention, and also from the children's point of view, the children did come, at least the eldest son, did come to the U.S. for three months several years ago. There was testimony in it and evidence. I can't hear you, the what? Oh, I'm sorry. The eldest child traveled here previously for a three-month period when Appellant's father passed away. So Appellant came here for a month, and Mr. Pantelaris and his son stayed here for three months. And in that case, three months, no one has made any allegation that that changed his residence, even though he was around his family in the U.S. for three months. So now it appears we're arguing at a period of time between three months and a year or so, where is that line? And again, there's no bright line. It's just looking at all of the factors. And also in this case, we know that the family was here as a whole. First, they started in Hawaii, were there for about a month, came to the Ohio area, were here from approximately April through December with the family unit. And then Mr. Pantelaris went back to Australia. Let's say they were here, let's say they had an agreement to come for four years and then go back. Does that mean he automatically wins? I mean, at what point does it become your new environment? No, Your Honor, because I think that would be a subjective intent if it were an agreement for one or four. Here we're going purely on the facts. No, no, but let's say that's the intent. They all agree they're going to go back after four years. And then he says, four years are up, let's go. And she says, no. And she wrongfully says, I'm not going to do what I promised to do. Do they still go back? Is that still their habitual environment? Your Honor, I would think after four years, you'd look at the facts, you'd look at whether they became acclimatized to the U.S. And perhaps after four years, their true habitual residence had changed. Subjective intent didn't matter if they intended one year or four. But on the facts of that case, if everybody were here for four years, it very well might be that from the children's perspective, yeah, we've been here four years. This is our home now. We just didn't have that in this case. They were here for a shorter period of time. And part of that time from December 2012 until the wrongful retention, their dad was on the other side of the planet. They were keeping in touch with him over Skype. They knew he wasn't around. So I don't know how they would feel settled when they're not living there with their family. And in some, Mr. Pantelaris just wanted to give his kids an experience he had as a child, an extended holiday in another country to experience their culture and here to visit with family. He never anticipated that his desire to be a good father be used against him as a way for his wife to keep their children in the U.S. with her and her new romantic partner that she found while living here. Any conclusion other than that reached by the district court would simply eviscerate the wrongful retention provisions of the Hague Convention and provide the means for a parent to steal away his or her children from the other parent without recourse and at the convention by proposing a vacation of any extended length in another country. That just can't be the law in the district courts. Judgment should be affirmed. Thank you. Mr. Jackson, you have five minutes. Thank you. Opposing counsel indicated that the respondent simply failed to present enough evidence or any evidence of what happened with the children's lives from March of 2012 when they came to the United States and May of 2013, the date of the alleged wrongful retainment. That is simply not the case. First of all, I would like you to be aware that this was a five-hour hearing, which is a very limited amount of time to be able to present testimony, exhibits, and other evidence on such an important issue. Did you object to that in the case? I filed a motion requesting additional time, which was denied by the- Have you appealed that ruling? Yes. No, I did not. No. Did you proffer any evidence you would have put in the evidence had you been given more time? The additional evidence would have been the other witnesses that we had present, as well as the teachers and therapists of the minor children. Did you place in the evidence the proffer of their testimony, though? No. So we could look at it now and say, well, you know, the court- Aren't you required? I mean, if you were going to argue that the trial court wrongfully excluded evidence or wrongfully refused to consider evidence, we have to know what the evidence would have been, don't we not? Do we not? I understand what you're saying. I think my argument is that she allowed us five hours and the petitioner presented first, which meant that we had whatever time was left of that five hours not knowing how much we could actually get in during that time. There was no opportunity to go any longer than five hours. So during the hearing, we were constantly watching the clock to try to determine, you know, how much time are we going to have to get this in front of the judge today. Regardless of how much was presented during that time, though, there was sufficient amount of evidence- Okay, I mean, I just- You know, I'm looking at your brief, the statement of issues presented for review. There are four issues presented there. And I don't see that the issue on appeal that I'm asked to rule on today, that the trial judge abused her discretion by limiting you to a five-hour hearing. I mentioned it under the- No, you mentioned it. We decide issues. If you wish to get a ruling from us, you have to specify what issues you want us to rule on. I don't see it. Is it here? Not as an issue, no. Okay, well, then it's waived. Okay. Well, at least that's my position. If you want to cite me authority of the opposite, I'll be willing to consider it. Okay. What I think is more important is that between March of 2012 and May of 2013, the testimony before the court was sufficient, not just sufficient, but was extensive enough for the court to determine that the children had acclimated to a new country and that they had become well-settled from their perspective. In Robert v. Tesson, the court looked to the Carcannon case out of the third district and looked at the things the court should consider in determining if a child has become acclimized. And those things included primarily the children's schooling, the social engagement, participation in sports programs and excursion, meaningful connections with people and places in the child's new country, and also the amount of personal belongings brought. There was significant amount of testimony both elicited through the petitioner and cross-examination as well as from the respondent and all the other witnesses that the children's only formal schooling occurred in the United States. There was testimony that the oldest child started kindergarten and had completed an entire year of kindergarten during the 15 months that he was here. In addition, the middle child started preschool and completed a full year. The four-month-old had been enrolled in a daycare and had been in that daycare the entire 15 months that she was here. In addition... I mean, do you agree with the trial judge's ruling that the period after the wrongful retention cannot be used in evidence to establish the habitual residence? That she's limited to the period prior to the wrongful... I believe that is correct, but I believe that the testimony that she would not listen to was testimony that said, in particular regarding the child that was autistic, that a plan had been developed through the Ohio Department of Education that was an ongoing plan. And I believe my client was trying to explain that he had started here. He was diagnosed and he started here in this plan and this is everything that he had done and that the important part of the plan was that there was ongoing treatment in certain steps that he was to meet. And I think she was trying to explain how he had come so far in going through that plan that was initially developed when he got there. And I believe that that was what she was determining was inadmissible, but there wasn't really a point in time where she could have said, as of May of 2013, this is how well he had progressed because the progression of that child was on kind of a continuum. So I believe in terms of that, that that needed to be considered, that this plan had been developed and that the important part of it was that there was a progression and that he maintained consistency because that was necessary for an autistic child, consistency with teachers, therapies, and therapists was what she was trying to say was so important and why that 15 months meant so much to this particular child. Were you the child lawyer? Yes, I was. Oh, because I'm just asking because I saw another name down here. Yes, upon filing the appeal, I have co-counsel who's not here today. Any further questions at this time? Silent, Judge White. Thank you. All right, thank you very much, counsel. The case will be submitted and we recognize there's a...